**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**CEDRIC DEON DREW,**<br><br>**Defendant.** | **Case No. 25-CR-00269-SEH** |

## OPINION AND ORDER

Before the Court is Defendant Cedric Deon Drew's Opposed Motion to Suppress Illegally Obtained Evidence and Brief in Support. [ECF No. 21]. Drew seeks to "suppress all unconstitutionally seized evidence during the unlawful traffic stop on November 24, 2024." [*Id.* at 1]. This case involves a traffic stop that led to the recovery of certain evidence that the government might use against Drew. Drew argues that evidence should be suppressed on several grounds. For the reasons explained in more detail below, the Court DENIES Drew's motion.

### I. Background

The Court held an evidentiary hearing on this matter on July 27, 2026, during which the Court heard argument from the parties along with the

testimony of Officer Wesley Caldwell[1] with the Tulsa Police Department. During the hearing, Defendant also admitted several exhibits. The Court considered all the testimony, exhibits, and the parties' motions and exhibits in the record to make the following findings.

Caldwell and his partner were on duty one evening parked at a QuikTrip convenience store ("QT") that was located at the corner of an intersection. Caldwell observed a white car change lanes without signaling while it was travelling in the intersection by the QT, so he and his partner left the QT to follow and stop the white car because of this maneuver. After pulling the white car over into a parking lot, Caldwell approached the driver, Defendant Cedric Drew, and informed him that he was being pulled over for changing lanes without signaling. The driver-side front window was only partially rolled down, but there was a sufficient gap for Drew and Caldwell to communicate and pass objects between each other as needed for a traffic stop. Caldwell testified that the driver was visibly nervous, but that is not apparent from the bodycam footage at the time Caldwell approached the vehicle and the following minutes. Caldwell also noted that the passenger in the white car sat directly behind Drew, rather than in the front passenger

[1] The Court credits Caldwell's testimony as its findings unless otherwise indicated in this background section or elsewhere in this order. *See United States v. Jackson*, No. 25-5037, 2026 WL 913721, at *1 n.1 (10th Cir. Apr. 3, 2026).

seat. Caldwell described this as "extremely odd." But because there were objects in the other seats and floorboards, the passenger's placement in the car was not particularly unusual.

Caldwell asked Drew for an identification card, but he indicated that he did not have one. It is difficult to hear Drew in the bodycam footage at that point, but Caldwell testified that Drew stated he "does not have his ID on him." As he testified about what he does when a driver does not have a license, Caldwell stated he could have *either* cited *or* arrested Drew, but he could not allow him to drive the vehicle.

Caldwell also asked Drew for his name, date of birth, and where he lived, all of which Drew provided. Caldwell testified that Drew was acting "very weird" and his responses were "very delayed." But again, Caldwell's perception does not bear out from the bodycam footage. Drew's responses were quiet and, perhaps, somewhat delayed, but Drew's responses and affect were not so abnormal that they could reasonably raise suspicion. After taking this preliminary information, Caldwell asked Drew whether there was anything "crazy" in the car, such as any guns, marijuana, methamphetamine, or fentanyl, which Drew denied. Caldwell then pivoted to ask Defendant where he and the passenger of the car were going. Caldwell testified Drew and the passenger said they were coming from a house that "nobody knows where it's at."

Apparently observing a container in the car, Caldwell then pivoted again and immediately asked "what's in that little weed container?" Caldwell testified that, based on his training and experience, containers such as the one in the white car typically contain dab (a concentration of marijuana and THC) or any other kind of drug. On cross-examination, however, Caldwell also testified that there was no marijuana leaf or marijuana branding on the container, and that such containers can be used for other legal purposes. Based on the circumstances in this case, the Court finds that the container was innocuous, and that Caldwell did not provide any supporting information as to what it was about his training or experience that made him believe that the container held drugs. Responding to Caldwell's question about the "weed container," Drew told Caldwell that the car was his sister's, and that he did not know what was in the container. Caldwell then told Drew "open it for me." Drew picked up the small container, held it at the edge of the car window, and Caldwell reached into the vehicle to take it out of Drew's hand. Caldwell opened the container and immediately stated "there's some methamphetamine in here." Two minutes and fifteen seconds elapsed between Caldwell approaching Drew and his discovery of the methamphetamine.

After discovering the container, Caldwell then asked Drew to exit the vehicle. Drew complied and handed Caldwell an object that had been hidden

underneath Drew's crotch while he was sitting in the white car. The object was a crystal pipe with black caked residue on the inside of it, though Caldwell also identified the object as a "meth pipe." Caldwell's partner patted Drew down, and Caldwell put Drew in handcuffs. Caldwell told Drew that he was not under arrest at that time, but he was being detained. Caldwell's partner took Drew to stand by the hood of the officers' car, which was parked just behind the white car. Caldwell briefly spoke with the passenger, checked her for a gun, and then he began searching through the vehicle. While conducting the search, Caldwell's parter told him: "Under the Seat. Gun." Caldwell recovered a handgun from under the driver's seat where Drew was sitting. After securing the handgun in the back of his vehicle, Caldwell then searched the passenger's purse and the rest of the car's cabin, but he did not recover anything else.

Caldwell then returned to his vehicle to run a records search on Drew, and he confirmed that Drew had a felony conviction. After confirming that information, Caldwell gave Defendant a *Miranda* warning. Drew acknowledged and voluntarily waived his *Miranda* rights, and he answered questions about the methamphetamine and gun. Rather than impounding the white car, Drew's mother came to pick it up. Drew's mother informed Caldwell that she told Drew it was his sister's car, and his sister did not want Drew to drive it. Drew's mother also said that Drew had stolen the keys.

## II. Discussion

Drew contends that his Fourth Amendment Rights were violated for several reasons. Therefore, the Court must determine whether a violation occurred, and, if so, what must be done because of the violation.

### A. The Traffic Stop was Justified at its Inception.

Drew argues that the traffic stop was not justified at its inception for two main reasons: (1) that the intersection and lane Drew travelled into did not have lane markings; and (2) that from the officers' vantage point at the QT, they could not see the side of the car that Drew could have signaled using his hand or arm. [ECF No. 21 at 6–8]. Among other things, the government responds that "officers acted in good faith and reasonably believed Drew committed a traffic violation before the stop." [ECF No. 23 at 8]. The Court agrees with the government on this point.

Officers may make objectively reasonable mistakes of fact without violating the Fourth Amendment. *See Heien v. North Carolina*, 574 U.S. 54, 60–61, 66–67 (2014); *Bustillos v. City of Artesia*, 98 F.4th 1022, 1030 (10th Cir. 2024). Indeed, an officer's burden at the reasonable suspicion stage is a low bar. *United States v. Ulibarri*, 149 F.4th 1193, 1198 (10th Cir. 2025). The Court will first address the lane change issue, and then the signaling issue.

While the photos submitted by Defendant show a lack of lane markers in the part of the road Drew occupied *after* crossing the intersection, there are

clear lane markers on the part of the road Drew occupied *before* he crossed the intersection. The time stamp on Caldwell's bodycam begins at 23:00:19, which is just after 11:00 p.m. It is also obvious from the video that it was taken at night, thus making it more difficult to see the intersection markers and the part of the road on the other side of the intersection. It was reasonable to assume that the lane markings would continue on the other side of the intersection. Given these surrounding circumstances, any mistake Caldwell made regarding the basis for the stop as to a lane change violation was reasonable because it is clear enough that Drew at least changed the side of the road he was on after he crossed through the intersection. Because it is unlawful to change lanes without signaling, 47 O.S. § 11-309, any mistake made by the officers was reasonable.

As for the signaling issue, the Court finds that any mistake made by the officers on this issue was likewise a reasonable mistake. If Drew did in fact signal a lane change with his hand or arm, it would be reasonable for the officers to have mistakenly not seen such a signal. The Court does acknowledge that Drew would have made a hand signal from the opposite side of the vehicle from where the officers observed the white car. But Caldwell's bodycam footage shows that the white car's tail lights were operating properly, and the footage also clearly shows that the vehicle's hazard lights—which operate by illuminating both signal lamps—were

activated by Drew, and they were properly functioning. What is more, 47 O.S. § 11-605 provides:

> Any motor vehicle in use on a highway shall be equipped with, and required signal shall be given by, signal lamps when the distance from the center of the top of the steering post to the left outside limit of the body, cab or load of such motor vehicle exceeds twenty-four (24) inches.[2]

The Court finds it reasonable for officers to believe that a vehicle with properly functioning tail lights would ordinarily use signal lamps (*i.e.* turn signals) rather than using hand signals, especially at night. It also would have been reasonable for officers to believe that the distance from the "top of the steering post to the left outside limit of the body [of the white car] exceeded twenty-four (24) inches," *Id.*, thus requiring the use of signal lamps. Based on the circumstances of the traffic stop in this case, the Court finds that Caldwell and his partner had reasonable suspicion to believe that Drew committed a traffic violation, and that even if they were incorrect about the facts supporting reasonable suspicion, their mistakes were reasonable.

[2] The Highway Safety Code defines "highway" as: "The entire width between the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel." 47 O.S. § 1-122. The parties do not dispute that Drew was driving on a "highway" as defined in statute, even though most ordinary people would likely call the site of the traffic stop a road or street.

### B. Caldwell Violated Drew's Fourth Amendment Rights by Impermissibly Deviating from the Permissible Scope of the Stop.

As a preliminary matter, the government argues that Drew does not have standing to challenge the *search* of the white car. [ECF No. 23 at 8–10]. Regardless of whether that is true, the government does not object to Defendant's standing to challenge the *seizure* of his person during the traffic stop. The Court finds it appropriate to proceed regardless of whether Drew has standing to contest the search of the white car and its contents because he has standing to challenge the *seizure* of his *person*, and the fruits of that seizure. *See United States v. Wilson*, 96 F. App'x 640, 643 (10th Cir. 2004) (finding that a defendant who did not assert an interest in a truck or its contents may nevertheless "contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal detention.") (quoting *United States v. Nava–Ramirez*, 210 F.3d 1128, 1131 (10th Cir.2000)).

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. This typically requires law enforcement officers to have probable cause before conducting a search or seizure. But there is an exception to this requirement for brief investigatory stops, which are more commonly known as *Terry* stops. In *Terry v. Ohio*, 392

U.S. 1 (1968), the Court "created a limited exception to" the prior general rule that "any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause." *Florida v. Royer*, 460 U.S. 491, 498 (1983). The Court held in *Terry* that "certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Id.*

Traffic stops are analyzed under the same principles that govern *Terry* stops. *United States v. Morales*, 961 F.3d 1086, 1090 (10th Cir. 2020). Courts engage in a two-step inquiry to evaluate the reasonableness of the stop. *Id.* The first question is "whether the officer's action was justified at its inception," and the second question is "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 1090–91 (quoting *United States v. Cash*, 733 F.3d 1264, 1273 (10th Cir. 2013)). "The first prong of the Terry analysis is satisfied 'if the officer has ... a reasonable articulable suspicion that [a] particular motorist violated ... applicable traffic ... regulations.'" *Id.* at 1091 (quoting *United States v. Salas*, 756 F.3d 1196, 1200-01 (10th Cir. 2014)). The second prong requires "examining both 'the length and scope of a traffic stop.'" *Id.* (quoting *United States v. Holt*, 264 F.3d 1215, 1227 (10th Cir. 2001) (en banc), *abrogated on*

*other grounds as recognized in United States v. Stewart*, 473 F.3d 1265, 1269 (10th Cir. 2007)).

The detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Young*, 99 F.4th 1136, 1147 (10th Cir. 2023) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). "The scope of the detention must be carefully tailored to its underlying justification." *Id.* (quoting *Royer*, 460 U.S. at 500). "There is no bright-line rule to determine whether the scope of police conduct was reasonably related to the goals of the stop; rather our evaluation is guided by common sense and ordinary human experience." *Id.* at 1148 (quoting *United States v. Albert*, 579 F.3d 1188, 1193 (10th Cir. 2009)).

As explained above, Caldwell had adequate justification to conduct the traffic stop. But Caldwell stepped into an area he should not have when he asked Drew about the "weed container." At the time Caldwell asked Drew about the container, the scope of Caldwell's mission was to diligently investigate traffic and driving-related offenses. Caldwell's question and deviation was not "carefully tailored" to the justifications for the stop, nor did it have anything to do with a topic that had a "'close connection to roadway safety,' such as … determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of

insurance." *United States v. Frazier*, 30 F.4th 1165, 1180 (10th Cir. 2022) (quoting *Rodriguez v. United States*, 575 U.S. 348, 356 (2015)).

And what is more, nothing about the container or its contents could have possibly informed Caldwell's investigation into a lane change violation and/or failure to signal, or whether Drew had a license. There are, of course, exceptions to the scope limitations on traffic stops, but the government does not address the scope issue at all in its response brief. The government focuses on other issues instead; namely, whether the traffic stop was justified at its inception, [ECF No. 23 at 5–8], whether Drew has standing to challenge the search of the white car, [*Id.* at 8–10], whether the search of the white car was incident to a lawful arrest, [*Id.* at 10–14], and whether discovery of the firearm was inevitable, [*Id.* at 14–16].

At bottom, Caldwell abandoned his investigation of the traffic-related offenses, however briefly, to pursue a completely unrelated matter without an adequate basis to do so. Because Caldwell impermissibly deviated from the scope of the stop in violation of the Fourth Amendment, the seizure was unlawful at that point.

### C. <u>The Evidence Obtained After Caldwell's Unlawful Deviation Need Not be Excluded Because it Would Have Inevitably Been Discovered.</u>

Because the Court determines that Caldwell impermissibly deviated from the scope of the stop, the Court must now determine whether to suppress the

evidence discovered after the deviation under the exclusionary rule. *United States v. Elmore*, 101 F.4th 1210, 1220 (10th Cir. 2024). "The exclusionary rule is 'the principal judicial remedy to deter Fourth Amendment violations.'" *Id.* (quoting *Utah v. Strieff*, 579 U.S. 232, 237 (2016)). "It generally requires courts to exclude not only evidence 'obtained as a direct result of an illegal search or seizure,' but also so-called 'fruits of the poisonous tree'—that is, evidence discovered later but derived from the Fourth Amendment violation." *Id.* (cleaned up). "But the significant costs of this rule have led [the Supreme Court] to deem it 'applicable only ... where its deterrence benefits outweigh its substantial social costs.'" *Streiff*, 579 U.S. at 237 (citation omitted). Suppression is a "last resort" option, not the Court's "first impulse." *Id.* at 237–38 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The question of whether to suppress evidence is a burden-shifting exercise that was described well in *United States v. Elmore*, 101 F.4th 1210, 1220 (10th Cir. 2024) (internal citations omitted and emphasis in original):

> To suppress evidence under the "fruit of the poisonous tree" doctrine, the defendant must establish a "factual nexus between the illegality and the challenged evidence." This nexus need not be "particularly tight." The "defendant need only show that 'the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct.'" In other words, the evidence must be "in some sense the product of illegal governmental activity." Once the defendant satisfies this nexus requirement, the burden shifts to the government to show that the challenged evidence "is *not* 'fruit of the poisonous tree'" under an exception to the exclusionary rule.

Drew has adequately shown a factual nexus between Caldwell's unlawful deviation and the evidence obtained during the traffic stop after the deviation. The only information available to Caldwell at the time he deviated was that Drew likely committed traffic-related offenses. The only way that Caldwell had access to the small container in the car was a direct result of his deviation, which completely transformed the nature of the stop. After searching the small container, Caldwell then quickly proceeded to search the rest of the white car, leading to discovery of the rest of the evidence, including the firearm and the statements Drew made to Caldwell and his partner.

The next step in the inquiry is whether the government has established that an exception to the exclusionary rule applies. There are several exceptions to the exclusionary rule, such as the independent source doctrine, the inevitable discovery doctrine, and the attenuation doctrine. *Streiff*, 579 U.S. at 238. The government asserts that the inevitable discovery doctrine applies under these facts. [ECF No. 23 at 14–16]. The Court agrees with the government on this point.

"[I]llegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" *United States v. Salas*, 106 F.4th 1050, 1055 (10th Cir. 2024) (quoting *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014)). "The 'lawful means need not be a second, independent investigation. Rather, the inevitable discovery doctrine

will apply if there was 'one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal.'" *United States v. Loera*, 923 F.3d 907, 928 (10th Cir. 2019) (citation omitted). "The key to applying this doctrine is to place the government officers in the 'same positions they would have been in had the impermissible conduct not taken place,' and, from that vantage point, to ask whether the government would have inevitably discovered the evidence lawfully." *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 447 (1984)). The government must prove inevitable discovery by a preponderance of the evidence. *Id.* And because the Court cannot *know* what would have happened without the unlawful deviation, hypothetical reasoning is required. *See United States v. Streett*, 83 F.4th 842, 849 (10th Cir. 2023).

The government's inevitable discovery argument rests on its contention that "officers would have inevitably discovered the firearm once Drew exited the car." [ECF No. 23 at 14]. The Court must place Caldwell in the same position as he would have been had he not impermissibly deviated from his investigation of traffic-related offenses. When Drew told Caldwell that he did not have a license, Caldwell told him that he could "work with that." That lends credence to the idea that Caldwell felt he had two options: he could have *either* cited *or* arrested Drew.

However, Caldwell testified that he would not have let Drew drive the vehicle away without a license. That means that Drew was going to have to exit the white car. And based on the circumstances at the scene in this case, including the presence of another officer to help maintain tabs on the vehicle's other occupant who was also sitting on the driver's side, it is established by preponderance of the evidence that either Caldwell or his partner would have observed Drew exit the white car. Because the crystal pipe was obstructed from view only by Drew's body and the partially raised car window, Caldwell or his partner would have seen it when Drew got out of the vehicle. Discovery of the crystal pipe would have given Caldwell probable cause to search the vehicle, thus inevitably leading to discovery of the small container, firearm, Drew's statements, and any other evidence obtained during the traffic stop. Therefore, the Court finds that the government has shown by a preponderance of the evidence that the evidence obtained during the traffic stop would have been inevitably discovered.

Although Drew has adequately established a factual nexus between Caldwell's improper deviation and the evidence obtained during the traffic stop, the government has sufficiently established that the evidence discovered during the traffic stop would have been inevitably discovered and remains admissible.

**D. <u>Other Matters</u>**

The Court acknowledges that the government also argues that Caldwell "had probable cause to search the area immediately surrounding Drew incident to arrest, since Drew admitted to driving without a license." [ECF No. 23 at 10]. However, this issue only deals with the question of whether Caldwell's *search* of Drew's person and the vehicle was permissible *without a warrant*, not whether the evidence discovered as fruit of the unlawful *seizure* of Drew's person should be *suppressed*. Because the Court fully addressed the fruit-of-the-poisonous-tree and inevitable discovery issue as to the unlawful seizure, the Court need not address this or any other issue any further.

**III. Conclusion**

For the reasons set forth in more detail above, Defendant Cedric Deon Drew's Motion to Suppress Illegally Obtained Evidence and Brief in Support, [ECF No. 21], is DENIED.

DATED this 21st day of August, 2026.

Sara Hill

Sara E. Hill
UNITED STATES DISTRICT JUDGE